*Exhibit A*

# AFFIDAVIT

I, Michael J. Ciesliga, being duly sworn, do hereby depose and state:

## I. INTRODUCTION

1. I am a Task Force Officer with the United States Drug Enforcement Administration (DEA) and have been so assigned since March of 2016. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

2. I am currently assigned to DEA's Memphis, Tennessee Resident Office, a component of DEA's Louisville, Kentucky Field Division. Specifically, I am assigned to the High Intensity Drug Trafficking Area (HIDTA) group of the Memphis Resident Office and have been assigned to the group since March of 2016.

3. I am currently employed with the West Tennessee Violent Crime and Drug Task Force and have been since December of 2011. Prior to my employment with the West Tennessee Violent Crime and Drug Task Force, I was employed by the Collierville Police Department for over 5 years. Throughout my career in law enforcement, I served as a police officer assigned to the patrol division and as a detective assigned to the Specialized Enforcement Unit. I served as an undercover and plainclothes police officer and investigated street-level narcotics and human trafficking operations, in addition to other criminal investigations.

4. During my career as a Task Force Officer with DEA, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics investigations, search warrant applications, and various other law enforcement procedures. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; supporting undercover and human source operations in foreign environments; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing pen register and caller identification system data; conducting court-authorized electronic surveillance (including both domestic and foreign-based Title III wiretaps); and preparing and executing search warrants that have led to seizures of multi-metric ton quantities of narcotics, firearms, and other contraband.

5. Through instruction and participation in investigations, I have become familiar with the manner in which narcotics traffickers conduct their illegal business and the methods, language, and terms that are used to disguise conversations about their narcotics activities.

6. In addition, I have received extensive training in financial investigative techniques as well as laws pertaining to asset forfeiture. This training has also included investigative techniques used to investigate money laundering and Bank Secrecy Act violations.

7. The information contained in this affidavit is based, in part, on my personal knowledge and observations during the course of this investigation, as well as information provided to me by financial investigators with the U.S. Marshals Service and DEA, Task Force Officers and Special Agents with the DEA (hereinafter referred to as Agents). Additionally, this affidavit is based upon my training and experience as well as that of other law enforcement agents/officers working with me in this investigation. This affidavit is intended to support a Verified Complaint of Forfeiture, and does not purport to set forth all of the information about which I, or collectively the other agents involved in this investigation, have knowledge.

## II. PROPERTY TO BE FORFEITED

8. I make this affidavit in support of a Verified Complaint of Forfeiture for the following asset ("the defendant property"): **Six Hundred Seventeen Thousand Five Hundred Twenty-Four Dollars, Twenty-Four Cents ($617,524.24) in U.S. Funds from BBVA Compass Bank account #6722548084, in the name of Francisco Ley Tan.**

9. Based on the facts presented within this affidavit, there is a reasonable basis to believe that the defendant property was involved in violations of Title 18 United States Code §§1956 and/or 1957, and is therefore subject to forfeiture pursuant to Title 18 United States Code §981(a)(1)(A).

## III. INFORMATION KNOWN TO AFFIANT
## BASED ON TRAINING AND EXPERIENCE

10. Through my experience, education and training, I have become familiar with the means and methods of individuals engaged in narcotics trafficking and money laundering. I am also familiar with the means and techniques by which individuals who engage in the sale of narcotics launder, conceal, transfer, and/or spend their illegal profits to facilitate their unlawful activity and to avoid detection by law enforcement. Due to my familiarity with these methods, schemes, and operations used by drug traffickers and money launderers, I know that:

    a. Drug dealers often maintain, on hand, large quantities of United States Currency (USC) in order to maintain and finance their ongoing drug business.

    b. Drug dealers often amass large quantities of cash, which are the proceeds from the sale of illegal drugs. In order to avoid detection and be able to utilize their profits made from drug sales, dealers attempt to disguise and legitimize these profits through money laundering

activities such as: commingling drug proceeds with clean money in a bank account; using a business, LLC or corporation to disguise drug proceeds as legitimate business profit; using a business as a "front" to launder illegally derived funds and transfer money and/or wire money between bank accounts in order to further "layer" the original source of the money.

        c.    The Currency Transaction Report (CTR) (FinCEN Form 104), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for money launderers when they attempt to deposit or withdraw their illegal profits at those financial institutions. In order to evade the filing of a CTR, money launderers often structure their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal their ownership of the currency.

        d.    Drug dealers and money launderers often have signature authority over several bank accounts at several different banks. They do this in order to deposit or withdraw large amounts of currency spread over different banks to avoid having a CTR filed.

        e.    The majority of cocaine in the United States originates from Mexico, Central America, and South America. International drug traffickers and money launderers use a variety of means to move the narcotics to the United States and move the drug proceeds back to the source. These international money laundering methods could include trade based money laundering, reverse money laundering, structuring, false identities, and/or the use of shell corporations.

### IV. INVESTIGATION AND INDICTMENT OF JACKIE ARNOLD DRUG TRAFFICKING ORGANIZATION

11.    In approximately July of 2016, the DEA initiated a criminal investigation into the Jackie ARNOLD drug trafficking organization. Through the use of court-authorized federal Title III wire intercepts, investigators discovered that this organization was distributing large amounts of cocaine, heroin, and marijuana in the Memphis, Tennessee metropolitan area. In July of 2017, defendants Timothy Woods, Alfredo Arambul, Juan Cisneros, Carlos Lopez, and Rafael Garza were indicted by a federal Grand Jury in the United States District Court for the Western District of Tennessee for Conspiracy to Possess with the Intent to Distribute Five Kilograms or More of Cocaine. This indictment stemmed, in part, from the seizure of approximately 14 kilos of cocaine in Memphis in June of 2017. In August of 2017, a Grand Jury returned a True Bill in a superseding indictment in this investigation, charging the following additional defendants in this conspiracy: Anthony Hope, Tiffany Harper, Anthony Gilliam, Corey Blair, Ricky Dortch, Marcus Joyner, and Johnny Smith.

12. After the first two indictments, through a variety of investigative means, the DEA began to investigate ARNOLD, who was a member of the drug trafficking organization described *supra* and a large-scale cocaine trafficker in the West Tennessee region. During the course of this investigation, investigators employed multiple Title III wire intercepts on telecommunications devices used by ARNOLD. Through the interception of these communications, agents were able to identify numerous drug distributors, money couriers, money laundering techniques, and other sources of supply in the organization.

13. On February 15, 2018, a federal Grand Jury in the Western District of Tennessee returned a second superseding indictment in this investigation, charging Jackie ARNOLD and 17 others with drug trafficking, weapons, and money laundering charges.

## V. THE SILVESTRE-MENDOZA DRUG TRAFFICKING ORGANIZATION

14. During the course of the investigation of ARNOLD's organization, investigators determined that members of the Sinaloa Cartel were supplying the cocaine that he was trafficking in the Memphis area. Through my training, education, and experience, I know that the Sinaloa Cartel is a prolific Mexico-based transnational criminal organization and one of the most dominant drug cartels in the world, responsible for trafficking multi-metric tons of cocaine, methamphetamine, and heroin from Mexico and Central and South America into the United States.

15. Investigators were further able to determine that ARNOLD's organization had acquired various "brands" of kilograms of cocaine from the Sinaloa Cartel. Based on my training and experience, I know that a "brand" is a marking or insignia stamped into a compressed brick of cocaine (typically embossed on each kilogram) to represent which laboratory or South American criminal organization is responsible for providing such cocaine, and to represent the quality and potency of cocaine. The "brands" of cocaine that ARNOLD's organization received from the Sinaloa Cartel were mainly "ROLEX", "SWASTICA", and "XXX". Investigators determined that the same "brands" of kilograms of cocaine that ARNOLD had been receiving from the Sinaloa Cartel over the course of the two years prior to his indictment are the same brands of cocaine being trafficked by the SILVESTRE-MENDOZA DTO.

16. The SILVESTRE-Mendoza drug trafficking is a trans-national, Guatemala-based cocaine trafficking organization that is directly supplying the SINALOA Cartel with cocaine. The SILVESTRE-Mendoza drug trafficking has an established network of drug transporters who obtain multi-hundred kilogram loads of cocaine in the central and southern portions of Central America (principally Honduras, Nicaragua, Costa Rica, and Panama) transport the cocaine northward through Guatemala and into Mexico, into the hands of the Sinaloa Cartel. It is therefore reasonable to believe that cocaine which was originally trafficked by the SILVESTRE-Mendoza drug trafficking organization in Central and South America has been transported to the Western District of Tennessee and further distributed.

4

## VI. DEA INVESTIGATION OF THE MONEY LAUNDERING ARM OF THE ORGANIZATION

17. Before the indictments of members of the Jackie ARNOLD drug trafficking organization in the Western District of Tennessee, the DEA's Memphis Resident Office had already begun an international narcotics trafficking investigation targeting a narcotics trafficking network operating in Colombia, Panama, Honduras, Costa Rica, Guatemala, Mexico, and the United States. This organization, led by Marisela FLORES-Torruco, a/k/a "LA DAMA DE HIERRO" (The Iron Lady), was responsible for coordinating the transportation of multi-metric ton quantities of cocaine between South and Central America into the United States. Additionally, FLORES-TORRUCO's organization was laundering millions of dollars in U.S. Currency generated in the United States from drug sales, namely the sale of multi-kilogram quantities of cocaine. Qiyun CHEN, a/k/a "CHINALOA", was identified as one of the principal coordinators of illicit money laundering operations on behalf of FLORES-Torruco and her organization. During this same investigation, agents determined that CHEN was being directed by Mexico-based money launderer Xizhi LI a/k/a John LEE a/k/a Francisco Ley TAN (hereafter referred to in this affidavit as LI a/k/a LEE a/k/a TAN).

18. Agents discovered that CHEN and LI a/k/a LEE a/k/a TAN have been using sophisticated money laundering techniques, including bulk cash smuggling, mirror transfers, trade based money laundering, and other schemes, and have often communicated between one another and with other traffickers using encrypted applications and other applications that are increasingly difficult to intercept pursuant to Title III.

19. During this investigation, the DEA seized approximately 2,300 kilograms of cocaine directly coordinated by Marisela FLORES-Torruco and supported by both CHEN and FLOREs-Torruco's drug trafficking / money laundering organization. Further, during the course of this investigation, investigators also discovered that FLORES-Torruco was being supplied by the SILVESTRE-Mendoza drug trafficking organization, an organization engaged in trafficking the same brands of cocaine seized from the Jackie ARNOLD drug trafficking organization in Memphis, Tennessee.

20. In July of 2017, DEA agents located and arrested CHEN in Rosemead, California on a federal indictment from the Eastern District of Virginia charging her with violations of 21 U.S.C. §959 (possession, manufacture, and/or distribution of a controlled substance for purpose of unlawful import into to the United States) and 21 U.S.C. §963 (conspiracy to violate §959), which also alleged that she was part of a drug trafficking organization that had amassed over $62 million in drug proceeds. During the course of the arrest and subsequent consent search of the vehicle in which she was arrested, agents located and seized $28,000 in Western Union money orders and multiple telecommunications devices in accordance with both previous and ongoing

Title III electronic wiretaps. Your affiant and other agents conducted a search of these telecommunications devices. These devices contained multiple wire and electronic communications related to both money laundering and bulk cash smuggling operations, including international money laundering activities and bulk money movements in the United States.

21. Through a continued consensual review of these telecommunications devices, the DEA Office of Special Investigations (OSI) located a bank account with BBVA Compass Bank, which agents determined was likely used to hide drug proceeds and proceeds from illicit foreign money laundering operations. This bank account is styled Francisco Ley TAN (LI a/k/a LEE a/k/a TAN).

22. During the OSI's review of Chen's telecommunication devices they located numerous electronic communications between CHEN and an individual using the moniker "SUPER KING 99". A Cooperating Defendant (CD #1) identified SUPER KING 99 as a moniker that was used by LI a/k/a/ LEE a/k/a/ TAN. Investigators further believe that LI a/k/a LEE a/k/a/ TAN was also using the monikers "JL007" and "ORGANIZACION DIPLOMATICA". During these communications, CHEN and LI a/k/a LEE a/k/a TAN engaged in numerous communications describing multiple locations for money pickups throughout the United States. Specifically, LI a/k/a LEE a/k/a TAN, provided CHEN with numerous addresses for suspected money pickups of cocaine proceeds in the United States, in addition to wire transfers of hundreds of thousands of dollars.

23. Based on the aforementioned facts, as well as the criminal indictment of Qiyun CHEN a/k/a "CHINALOA", it is reasonable to believe that both CHEN and LI a/k/a LEE a/k/a TAN were major international money launderers who supported several trans-national drug trafficking organizations.

## VII.  INVESTIGATION OF LI a/k/a LEE a/k/a TAN
## AND SEIZURE OF BBVA COMPASS BANK ACCOUNT # 6722548084

24. BBVA Compass Bank Account #6722548084 ("the subject account") was opened on May 12, 2016 at the Heathbrook Branch in Ocala, FL. It was a money market account styled Francisco Ley Tan (hereinafter referred to in this section as TAN). TAN has two other known accounts with BBVA Compass Bank, account # xxxxxx2366 (a money market account) and #xxxxxx7573 (a checking account). Only account # 6722548084 was targeted by the investigative team for seizure. TAN is the sole signer of this account and has sole signature authority. The physical address provided for this account is 1450 Brickell Ave. Suite 2000, Miami, FL  33131. This is one of the corporate addresses for BBVA Compass Bank, and not a residential address. From my training and experience, I know it is highly unusual for a bank customer to list the bank address as their address of record.

6

25. To open this bank account, TAN produced Republic of Guatemala Passport #xxxxxxxxx0101. Through interviews with a cooperating defendant, and seized communications on CHEN's phone(s), agents have confirmed that the passport TAN used to open BBVA Compass Bank Account #6722548084 (the subject account) was created from fraudulent identification documents. In fact, investigators located the materials used to create these fraudulent documents for TAN on CHEN's telephone, which was seized during her arrest. On the Guatemalan passport TAN used to open the bank account, he used both a fictitious name and date of birth. The name and date of birth on his passport are different from the name and date of birth he gave for his U.S. naturalization paperwork, even though both photos are of the same individual. This information also differed from his State of California Driver's License, which explicitly listed a different name and date of birth for LI a/k/a LEE a/k/a TAN, even though the individual in each document was the same. Even more damaging, based on both cooperator statements and the seized communications described above, this identity was created for the sole purpose of attempting to mask illicit and illegal activity in the United States.

26. On all new bank accounts, customers are required to certify, under penalty of perjury, their citizenship status. On TAN's signature card for account # 6722548084, he declared "All owners of this account are nonresident aliens and each owner has provided the appropriate completed Form W-8." A W-8 form is an Internal Revenue Service (IRS) form that provides foreigners with exemption from specified U.S. information return reporting and backup withholding regulations. There are a variety of W-8 forms. The primary purpose of the W-8 form is to indicate to mutual fund companies and brokers that a foreign investor isn't subject to standard taxation practices where investment income is not taxed. In fact, TAN does have a Form W-8BEN on file with BBVA Compass Bank. The form is dated March 3, 2015. On this form, TAN listed his permanent address as Ave. Tikal Casa 46 SMZ 42 MZ 1 LT 101 Fracc Real Almena, Cancun, Mexico, 77507.

27. TAN had linked his other bank accounts, account #xxxxxx2366 and # xxxxxx7573, with the subject bank account to enable online transfers between the accounts. BBVA Compass Bank account # 6722548084 has been primarily funded by online transfers from checking account # xxxxxx7573, which again, is solely controlled by TAN.

28. On January 11, 2017, TAN's checking account #xxxxxx7573 received a very large wire transfer: $930,000 was wired to account # xxxxxx7573 from a Wells Fargo Bank account. The sender of this wire was listed as Richard Dwain Carnes with an address of 1825 Montview Lane, Steamboat Springs, CO 80487-9089. On the "Originator Bank Info" line, it reads "Purchase of a condo"; however, no address of any condo was listed. According to law enforcement real property databases, 1825 Montview Lane, Steamboat Springs, CO is, in fact, owned by a Dwain and Marla Carnes; however, they purchased it in 2012. Agents have queried Richard Dwayne

Carnes through a variety of law enforcement and real property databases and have been unable to locate any real property purchased by him in January of 2017.

29. Although Richard Dwain Carnes listed his address in Steamboat Springs, CO on the wire transfer information, law enforcement databases indicate that he actually lives in the Houston, TX area. Richard Dwain Carnes a/k/a Dwain Carnes owns three properties in Houston, TX:  616 Houston Blvd. South Houston, TX 77587; 702 Houston Blvd. South Houston, TX 77587; and parcel #0340800580016 on Houston Blvd., South Houston, TX 77587. (These properties are adjacent to each other.). According to public databases, a business called Carnes Motor Company operates a used car lot at this location.  Richard Dwain Carnes a/k/a Dwain Carnes is believed to be the owner / operator of this car lot. In addition, Richard Dwain Carnes has a TX driver's license which lists the address of 616 Houston Blvd. South Houston, TX 77587 as his primary address.

30. From my training and experience, I know that used car lots are a very cash intensive business and popular for drug dealers / money launderers to use as a means of introducing cash into the financial system. In addition, a wire transfer for the purchase of real property usually goes through a real estate attorney or title company and rarely from person to person.

31. Agents have also queried the travel of Richard Carnes a/k/a Dwain Carnes. This query revealed that Carnes has had approximately 24 international crossings between the United States and Mexico over the course of the last two years, almost all to Cancun, Mexico, the established site of this money laundering organization's operations. In addition, Cancun, Mexico is the physical address city listed on TAN's Form W-8BEN. Further, investigators seized electronic communications between CHEN and TAN discussing ongoing money laundering operations in Cancun while Carnes was on the ground in Cancun.

32. After the $930,000 wire transfer from Richard Dwain Carnes was posted in TAN's checking account in January, 2017, it then left that checking account in a variety of ways. The very next day, January 12, 2017, TAN transferred $897,000 to account # 6722548084 (the subject account) and $25,000 to his account # xxxxxx2366.  The next day, January 13, 2017, TAN then transferred $30,000.24 from his account #xxxxxx2366 into his account # 6722548084 (the subject account). At this same time, in January 2017, ATM withdrawals placed TAN's physical location in Cancun, Mexico. From my training and experience, I know that it is common for individuals engaged in money laundering to transfer money between multiple accounts in an effort to confuse law enforcement and the banking industry.

33. At this point, TAN had close to $1 million in the subject account.  He then started to slowly move money back into his checking account #xxxxxx7573, apparently for the primary purpose of sending out wire transfers. On January 23, 2017, TAN transferred $10,000 back into his checking account , and on January 24, 2017, he sent a $9,500 wire transfer to an account at

8

Bank of America in the name of Stephen Lee. Agents believe that Stephen Lee is the son of TAN and lives in the Los Angeles County, California metropolitan area.

34. On February 9, 2017, TAN made a small ATM withdrawal from account #xxxxxx7573 in Guatemala, which physically places him in Guatemala in early February 2017. On February 21, 2017, TAN transferred $65,000 from the subject account into his checking account # xxxxxx7573 for the purpose of sending out a $59,000 wire transfer on February 28, 2017. This wire was sent to account number xxxxxx8793 with CIBanco, SA. CIBanco is a large Mexican bank headquartered in Mexico City. The outgoing wire from TAN only listed the beneficiary account number and the bank address of Av Paseo De Las Palmas 215, Lomas De Chapultepec, Miguel Hidalgo 11000, Mexico.

35. On March 6, 2017, TAN transferred $85,000 from the subject account into his checking accounts # xxxxxx7573 for the purpose of sending out an $85,000 wire transfer on March 8, 2017. This wire also went to account number xxxxxx8793 with CIBanco, SA. There was, again, no individual beneficiary name listed.

36. On March 17, 2017, TAN transferred $355,000 from the subject account into his checking account #xxxxxx7573 for the purpose of sending a $355,000 wire transfer on March 17, 2017. This wire also went to account number xxxxxx8793 with CIBanco, SA. There was, again, no individual beneficiary name listed.

37. On April 13, 2017, for unknown reasons, TAN transferred $5,000 from his checking account xxxxxx7573 back into the subject account. Between April 13, 2017 and February 15, 2018, there was no further activity on the subject account except for interest payments. On February 15, 2018, the account was frozen via a State of Tennessee Notice of Seizure.

38. On February 22, 2018, the Honorable Charmiane Claxton, United States Magistrate Judge for the Western District of Tennessee, issued a seizure warrant for all funds on deposit and credited to BBVA Compassed Bank Account #6722548084. The execution of this warrant resulted in the seizure of $617,524.24 from the subject account, which constitutes the defendant property in this case. Following this seizure, the investigative case team continued with its investigation, which resulted in the discovery of the additional information discussed below.

### VIII. IDENTIFICATION OF WEIMING GAO AND FURTHER CONNECTION TO WDTN

39. During the course of investigating CHEN and the members of her drug trafficking organization, the investigative case team identified Weiming GAO as a criminal associate of Qiyun CHEN who aided CHEN in coordinating money laundering operations in Central America, Mexico, and the United States. Indeed, investigators discovered that GAO had traveled with

CHEN between China and Mexico (via the United States), and was the registered owner of the vehicle CHEN was occupying at the time of her arrest. Even more significantly, investigators discovered that GAO was aiding CHEN in transnational money laundering operations and structuring deposits of suspected cocaine proceeds and / or commission funds for the successful laundering of proceeds through the U.S. financial system.

40. Further, as investigators learned throughout the course of this investigation, money laundering coordinators and their lower-level criminal associates commonly receive a commission fee (typically between 1% - 5%) as a result of their money laundering services. These funds are typically retained by the money launderer in return for their services. In response, in order to avoid detection and investigation by law enforcement officials, these individuals will structure deposits of currency into their financial accounts (whether it be commission funds or funds laundered for the organization.

41. Investigators subsequently obtained financial records for GAO's Bank of America account (Account #xxxx xxxx 1589) and reviewed these records, which revealed substantial evidence of structuring deposits in an effort to avoid the currency reporting requirements set forth by the United States Department of the Treasury.

42. These structured deposits were made in the same vicinity as the purchase location of the aforementioned $28,000 in Western Union money orders (which were divided into twenty-eight $1,000 increments) in CHEN's possession at the time of CHEN's arrest. Furthermore, a cooperating member of the organization (hereinafter "CD #1") advised that GAO was involved in money laundering. CD #1 further stated that they had introduced GAO to an individual named Jiaxing CHEN to promote money laundering operations. Through concurrent and contemporaneous investigation, investigators discovered that Jiaxing CHEN is a large-scale money launderer based in Belize who was facilitating the transport of large quantities of cocaine proceeds throughout the United States and Central America.

43. CD #1 also stated that they introduced GAO to Xizhi LI, aka TAN, the holder of the subject account. CD #1 further stated that after GAO, CHEN and LI met to discuss laundering money, GAO and CHEN became partners in their criminal operations.

44. CD #1 advised that GAO used his bank accounts in China to launder money. CD #1 stated that GAO and CHEN opened bank accounts together in the Los Angeles, California area in furtherance of their money laundering efforts. Additionally, CD #1 stated that CHEN advised GAO how to intentionally structure deposits into American bank accounts so as to avoid reporting by the American banks in accordance with the Bank Secrecy Act. CD #1 stated that on several occasions, LI advised GAO to deposit money (drug proceeds) into one of CHEN's bank accounts. CD #1 also advised that LI was a boss within the money laundering elements of this criminal

organization and had numerous people working for him to launder tens of millions of dollars in drug proceeds around the world.

45. In CHEN's telephones alone, investigators discovered numerous events in which Qiyun CHEN served as intermediary for money transfers directed by LEE and ultimately carried out by GAO, including: a transfer of 338,500 Chinese yuan (hereinafter "RMB"; approximately USD $53,085) to Haiyun CHEN on 10/26/2016; transfer of RMB 203,100 (approx. USD $31,851) to Ziqi CHEN on 10/26/2016; transfer of RMB 100,000 to Choo Ewe CHUEN on 02/07/2017 (approx. USD $15,682).

46. Furthermore, through continued analysis of these telephonic devices and the seized electronic communications in these devices, investigators discovered that from approximately September 12, 2016 through approximately April 24, 2017, Qiyun CHEN directed Weiming GAO to conduct approximately 27 transfers on her behalf, with a grand total of RMB 10,652,708 (approximately USD $1,670,610). The top two beneficiaries of these transfers consisted of Dielei CHEN: four transfers totaling RMB 1,361,626 (approximately $213,537) and Jingyan SHEN: three transfers totaling RMB 1,297,520 (approximately $203,483).

47. Telephone records also establish a connection between CHEN and GAO's money laundering organization and the Western District of Tennessee. One of the individuals who received money transfers from GAO indicative of money laundering was Xian Jian DONG. Those transfers went to DONG's TD Bank checking account, ##xxxxxx1911. (A federal seizure warrant was issued for that account in November 2018; however, it was returned unexecuted because the funds had already been withdrawn). TD Bank records show that DONG listed the telephone number (646) xxx-x366 as a contact number for this account. Investigators obtained telephonic toll and geo-location information associated with this telephone number pursuant to an administrative subpoena. Investigators discovered that DONG's telephone number was in repeated contact with telephone number (646) xxx-x075, which was physically located in Memphis, Tennessee. Investigators subsequently obtained telephonic toll information associated with (646) xxx-x075, which revealed that this telephone number was associated with apparent fictitious subscriber information and was in contact with numerous Memphis-based telephone numbers. Furthermore, subsequent analysis through DEA indices revealed that this telephone number's contacts were in contact with telephonic numbers previously obtained for the DEA investigation involving Jackie ARNOLD and his criminal enterprise in Memphis.

## XII. CONCLUSION

48. Based on the foregoing, I believe that the defendant property was involved in transactions in violation of 18 U.S.C. §§1956 and 1957, and is therefore subject to forfeiture pursuant to 18 U.S.C. 981(a)(1)(A).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of April, 2019.

/s Michael J. Ciesliga
MICHAEL J. CIESLIGA
Task Force Officer
Drug Enforcement Administration
